IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 25, 2016

**STATE OF TENNESSEE v. JOSHUA JOHNSON**

**Appeal from the Criminal Court for Sullivan County**
**No. S62,610     James F. Goodwin, Judge**

_____

**No. E2016-00334-CCA-R3-CD – Filed December 28, 2016**

_____

The defendant, Joshua Johnson, appeals his Sullivan County Criminal Court jury convictions of 34 counts of sexual exploitation of a minor, *see* T.C.A. § 39-17-1003, claiming that the trial court erred by refusing to suppress the defendant's pretrial statement to the police, that the evidence was insufficient to support his convictions, and that the four-year effective sentence is excessive. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Ashley D. Boyer, Assistant District Public Defender (on appeal); and Brad Sproles, Kingsport, Tennessee (at trial), for the appellant, Joshua Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Barry P. Staubus, District Attorney General; and William Harper, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Sullivan County Grand Jury charged the defendant with 35 counts of sexual exploitation of a minor based upon his having certain images on his laptop computer. Prior to trial, the defendant moved to suppress the statement he made to the police. The trial court denied the motion, the State dismissed one of the 35 counts, and the case proceeded to trial on 34 counts of sexual exploitation of a minor.

At trial, Raeann Emerson testified that she dated the defendant from December 2012 until August 2013. The two lived together at the defendant's Sullivan County residence. During that time, the defendant owned and used a laptop computer,

and he allowed Ms. Emerson to use the computer as well.  On the evening of August 5, 2013, the defendant "was on the laptop and turned it in a weird way" so that Ms. Emerson would not be able to see the screen.  Because she thought the defendant's behavior odd, she looked at his computer search history after he went to sleep.  She described what happened next:

> I saw that there were some searches for preteen items like preteen models, preteens in panties, nude preteens, things like that and it concerned me deeply and so I clicked on one of the websites and saw some extremely questionable images and after that I searched, you know, what should I do about something like that and saw that I should contact the Center for Missing and Exploited Children so that's what I did and the Center for Missing and Exploited Children told me to contact the sheriff's department.

Ms. Emerson contacted the sheriff's department on the following morning, and when Officer Matt Harrison arrived at the residence she shared with the defendant, she showed him the images and gave him the computer.  She denied using the defendant's computer to search for child pornography.  She said that the defendant took the laptop to work with him 50 to 70 percent of the time.

Sullivan County Sheriff's Office Detective Matt Price, who was declared a computer forensics expert in the area of data retrieval, testified that on August 6, 2013, Officer Matt Harrison telephoned him and reported that he had viewed questionable images on a laptop belonging to the defendant.  Detective Price told Officer Harrison to collect the computer and asked Detective Tracy Haraz to obtain a statement from Ms. Emerson.  Detective Price then telephoned the defendant and asked if he would come to the sheriff's office to discuss the images.  The defendant agreed, and he arrived at the sheriff's office sometime after 8:00 p.m. that same evening.  Upon the defendant's arrival, Detective Price asked for and received the defendant's written permission to search the defendant's laptop computer, cellular telephone, and "thumb drive."  Detective Price then immediately began the process of copying the information from the defendant's cellular telephone.

After beginning the copying process, Detective Price returned to the interview room to question the defendant.  Detective Price recorded the defendant's answers into a handwritten statement that the defendant signed at the conclusion of the interview.  Detective Price then read the defendant's statement in its entirety to the jury:

"I have lived on Kings Meadow for six or seven years. I live there with Raeann Emerson. We were together for eight months. I met her on the website Ple[]ntyOfFish.com. She was from North Carolina. She moved in with me about seven months ago. I like porn. I like internet porn. I like girl on girl and sometimes I'm curious about guy on guy. Me and Raeann would have sex a lot. We'd have sex at least a couple of times a day. We would use sex toys sometimes. We like paddles. We would meet people on Craig's List and have threesomes with them. I'm addicted to porn. I also drink a lot. I drink five or six nights a week. I have also looked for child porn on the internet. I would use Google to search for it. I would search for teens, teens lingerie, preteen. I don't know what possess[ed] me to search for this kind of stuff. I was abused by a babysitter from church when I was 7 or 8. He raped me. I was also made to touch a female babysitter when I was young. She made me put . . . my finger inside her vagina. There was another guy, Nate, he was my neighbor. He was a teenager and I was 5. He made me suc[k] his d***. I have never even told anyone anything about this before. I honestly don't know why I search for the child porn on the computer. I'd say that the youngest image of a child that I have seen on the computer was probably around the age of 12. I remember that it was a female. I'm not really into the naked little girls. I would rather look at them with lingerie, panties or underwear. I don't think that I have ever searched for any boys on the internet. I have always looked for girls. Sometimes I would jack off while I was looking at the pictures of these kids. I have never saved any pictures that I know of. I tried to delete my internet history so my girlfriend wouldn't find it. I honestly don't remember where the thumb drive came from. I started drinking as a way to forget all the stuff that is bothering me. On a bad night I can finish off a whole bottle of rum. I drank 11 Steel Reserves last night. It's a very, very, very strong beer. I started drinking at 6 p.m. last night. I had to be at an in-service this morning at 9 o'clock. I felt fine this morning but if I had done a blood alcohol I don't know if I would have been over the legal limit but I felt fine. Sometimes I drink to get rid of the pain of the abuse when I was a kid. Maybe that's why I look at the picture of the kids to help me deal with it. The pictures of the kids that I have

[seen] on the internet, the one's naked are wearing lingerie. They look a hell of a lot better than I remember it. I have never touched or had sex with anyone that is under age. I don't want to submit anybody to that because I know how bad that it sucks. Raeann didn't know any of this. She knew that I was into porn, but she didn't know about my curiosity with underage kids."

Detective Price testified that the defendant's interview lasted just over an hour and that, following the interview, the defendant was allowed to leave the sheriff's office and return to his residence.

Detective Price testified that before beginning his forensic examination of the defendant's computer, he used specialized software to make an exact copy of the defendant's hard drive. He explained that this process enabled him to examine the contents of the device without making any changes to the device itself. After he created the copy of the hard drive, the detective used other software to search the hard drive for images that might contain child pornography. The initial examination first pulls up image "files that are active on the machine" and then searches for image files that have been deleted from the machine. The program uncovered the 34 images at issue in this case among the deleted images. Because the images had been deleted, Detective Price could not determine when or where they had originally been stored. He said that the images may have been "just viewed off the internet," but he insisted that each image "was definitely viewed on that machine." Detective Price explained, "At some point these pictures that were in question here, at some point they were definitely looked at and deleted. That's basically the only thing 100% certain I can tell you is they were viewed and they were deleted." He added, "It could be downloaded and deleted. It could have been search or history cleared and the cookies deleted. It could have been temporary files deleted." He identified the images he pulled from the defendant's computer, and they were published to the jury.

Detective Price also used a program called Internet Evidence Finder to examine the defendant's internet search activity and "social media stuff" and put "it into a viewable format." The program created a table listing the searches along with the date and time of the search as well as the search engine used. That list was published to the jury.

Detective Price found no images of child pornography on the thumb drive or the cellular telephone.

Following Detective Price's testimony, the State rested. The defendant elected to testify.

The defendant testified that, contrary to Ms. Emerson's assertion, he never took his computer with him to work as an emergency medical technician. He explained that he worked primarily 24-hour shifts in Washington, Hancock, and Hamblen Counties and that he sometimes worked 12-hour shifts in Washington County. He said that there would be no reason for him to take the computer with him. The defendant asserted that he had gone through his work records and had determined that some of the internet searches discovered by Detective Price and submitted to the jury had been performed at a time when he was at work. He stated specifically that searches conducted on July 28 and July 30 occurred at a time when he would have been at work. The defendant said that Ms. Emerson had access to his computer while he was at work, noting that although they both used the laptop in question, he considered the device "more hers than" his because he worked so much.

Regarding the statement he provided to Detective Price, the defendant said, "It's like, you know, this is what I signed but this isn't what I was under the impression that I was signing." He insisted that he did not read the statement and that he signed it only because he "wanted to get out of there." The defendant maintained that the statement was not accurate.

During cross-examination, the defendant insisted that he had lied to Detective Price, claiming that he did not know what the detective was talking about when he said that the defendant had child pornography on his computer. The defendant acknowledged that parts of the statement had been marked through and initialed, but he said that Detective Price "pointed where to initial." The defendant claimed that Detective Price had fabricated the entire statement and that he "went along with whatever he said" and then signed "whatever he put down on paper." He denied conducting the internet searches for child pornography.

Based upon this evidence, the jury convicted the defendant as charged of 34 counts of sexual exploitation of a minor. Following a sentencing hearing, the trial court imposed a sentence of four years for each of the defendant's convictions and ordered that all of the sentences be served concurrently in the department of correction, for a total effective sentence of four years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the denial of his motion to suppress his statement to Detective Price, the sufficiency of the convicting

evidence, and the propriety of the four-year effective sentence. We consider each claim in turn.

## I. *Suppression*

The defendant first asserts that the trial court erred by denying his motion to suppress the pretrial statement he provided to Detective Price, arguing that he was coerced into providing the statement during a custodial interrogation. The State contends that the trial court did not err by concluding that the statement was voluntarily given.

At the hearing on the defendant's motion to suppress his statement, Detective Price testified that following Ms. Emerson's complaint and the seizure of the defendant's laptop computer, Detective Price telephoned the defendant and asked if the defendant would be willing to meet with him to discuss the contents of the computer. The defendant agreed to meet with Detective Price after he got off work that same day. The defendant arrived at the sheriff's office at approximately 8:00 p.m. At that point, only Detective Price and Detective John Raymond were in the detective division. Detective Price said that he met the defendant in the front parking lot of the sheriff's office and escorted him into an interview room. He said that the defendant did not appear to be intoxicated or impaired in any way.

Detective Price said that he began the interview by telling the defendant that the sheriff's office had "received some information that there was some possibility that there was some child pornography on a computer that belonged to him" and that they "wanted to discuss this with him." He then asked for permission to examine the defendant's cellular telephone, and the defendant signed a consent form to search the cellular telephone, the laptop computer, and a "thumb drive." After the defendant signed the form, Detective Price left the room to hook the cellular telephone up to a machine to download its contents. He was out of the room for approximately five minutes. Detective Price said that he did not know whether Detective Raymond remained in the room with the defendant during that time.

When Detective Price returned to the room, he began to question the defendant about the images Ms. Emerson had reported seeing on his computer. He said that he asked the defendant "about the possibility of there being child pornography on his computer and if he knew anything about that and if he had ever searched for anything like that." Detective Price asked the questions and recorded the defendant's responses in the form of a narrative statement. Detective Price said that at the conclusion of the interview, he read the statement aloud to the defendant while tracing the words with his finger. He allowed the defendant to make corrections to the statement, and the defendant signed the

statement at the conclusion of the interview and initialed the corrections. According to Detective Price the interview began at approximately 8:14 p.m. and ended at 9:20 p.m.

Detective Price returned the defendant's cellular telephone, and then the defendant left the station and went home. Detective Price said that he told the defendant that he "would let it be known to the DA's office that . . . he did come in and give a statement and appeared to be pretty honest . . . during the whole investigation," but he denied making any promises or threats to get the defendant to provide a statement. He testified that the defendant did not, at any point during the conversation, request an attorney and did not ask to leave during the interview for any reason.

The defendant testified that he went to the sheriff's office voluntarily at Detective Price's request. He claimed that as soon as he arrived he asked the detective if he "needed a lawyer, and he said, 'No, you're not in any trouble, this is just a routine procedure.'" The defendant said that after taking him into the interview room, Detective Price asked to search his cellular telephone and then asked him to sign the consent form. The defendant said that, at that point, he "paused for a minute" because he was unsure of why he was there. He claimed that Detective Price told him that if he refused to sign the consent form he would be held at the sheriff's office until Detective Price could obtain a search warrant. The defendant insisted that he signed the consent form because he wanted to leave.

The defendant testified that Detective Price told him that his girlfriend had left him and turned him in, which prompted the defendant to ask to leave to call her. He claimed that Detective Price told him that he could not "call anyone especially her" and that if he "contacted her that he would place a restraining order on" the defendant. The defendant maintained that he "made mention several times that" he "wanted to leave" but that Detective Price told him he could leave when the interview was finished. The defendant said that he interpreted this to mean "[t]hat as long as [he] did what he said" then he would be permitted to leave. The defendant acknowledged that he did not "specifically" ask to leave.

The defendant said that he was permitted to go outside with Detective Raymond to smoke a cigarette. When he returned from smoking, he "said, 'I think that I may need an attorney.'" At that point, Detective Price "assured" him "that if [he] just cooperated and answered his questions that nothing would come of this." The defendant claimed that he "made a few more mentions of wanting to leave and once again he would say, you know, 'When we're finished or if you answer these questions.'" He claimed that Detective Price "said that it would be better for" him if he "just answered his questions." The defendant testified that he felt that he had no choice but answer the detective's questions, saying, "If I felt like I was free to leave as badly as I wanted to go I would

have left." He said that he was "not fully aware of everything that's in the statement" because Detective Price did not allow him to read it but instead said, "'The sooner you sign it the sooner you can go.'"

Upon questioning by the trial court, the defendant admitted that he did "not directly" say that he wanted a lawyer. He admitted that when he had not heard from Detective Price for several weeks, he telephoned the sheriff's office and left a message for Detective Price. He did not consult with a lawyer between the time he made the statement and when he called the detective.

At the conclusion of the hearing, the trial court noted that the defendant appeared to be intelligent and that he was well-spoken on the witness stand. The trial court noted that the defendant had marked through and changed different parts of the statement and placed his initials over the corrections. The trial court accredited Detective Price's testimony and found the defendant's testimony "pretty incredible." He said that he couldn't believe that the defendant would have signed a statement that contained such admissions or would have provided corrections without reading it. The court found "that there was nothing coercive about this, that there w[ere] no promises made to him that nothing would happen if he did this." The court went on, "I find that he was never told that he didn't need a lawyer and not to read this essentially, that it's just a hurry up . . . ." The court also found that the defendant's claim of coercion was undercut by his statement that he called Detective Price several weeks later to follow up. The court found that the defendant's statement "was voluntary and knowing and intelligently made, that he was not in custody, there was no force or coercion that was used, there were no promises made by the officer in return for this statement."

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional

muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[1]

Upon our review, we conclude that the record does not support the defendant's claim that his statement was involuntarily given or was the result of police coercion. The defendant, an emergency medical technician, voluntarily traveled to the sheriff's department in his own vehicle in response to Detective Price's request. The defendant suffered from no injury or illness during his interview, and he was not abused or deprived of food or sleep during the hour-long interview. Although the defendant claimed that Detective Price refused to let him leave without providing a statement and refused his requests for an attorney, Detective Price testified that the defendant never asked to leave and never asked for an attorney. The trial court accredited Detective

---

[1] This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

Price's testimony and found the defendant's testimony lacking in credibility. At the end of the interview, Detective Price returned the defendant's cellular telephone, and the defendant left the sheriff's office. Nothing in the record indicates that the defendant was in custody or that Detective Price's behavior overbore the defendant's will and forced him to provide a statement. In consequence, we conclude that the trial court did not err by denying the defendant's motion to suppress his statement to Detective Price.

## II. Sufficiency

The defendant next asserts that the evidence was insufficient to support his convictions because the State failed to establish that the images were downloaded by the defendant. He claims that because the times and dates of the internet searches recovered by Detective Price did not align with the date and time stamps on the images, it was impossible for the jury to conclude that the defendant, rather than Ms. Emerson, had downloaded the images.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[i]t is unlawful for any person to knowingly possess material that includes a minor engaged in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive." T.C.A. § 39-17-1003(a). The State may charge the accused "in a separate count for each individual image, picture, drawing, photograph, motion picture film, videocassette tape, or other pictorial representation." *Id.* § 3917-1003(b). When determining the sufficiency of the State's evidence,

the trier of fact may consider the title, text, visual representation, Internet history, physical development of the person depicted, expert medical testimony, expert computer forensic testimony, and any other relevant evidence, in determining whether a person knowingly possessed the material, or in determining whether the material or image otherwise represents or depicts that a participant is a minor.

*Id.* § 39-17-1003(c). That being said, "the state is not required to prove the actual identity or age of the minor." *Id.* § 39-17-1003(e).

Examined in the light most favorable to the state, the evidence adduced at trial established that Ms. Emerson examined the defendant's internet search history after observing his strange behavior while using the laptop computer. She discovered searches "for preteen items like preteen models, preteens in panties, nude preteens," which led her to "questionable images." She reported her findings to the Sullivan County Sheriff's Office, which seized the defendant's computer. The defendant provided a statement to Detective Price wherein he acknowledged having "looked for child porn on the internet," saying, "I would use Google to search for it. I would search for teens, teen lingerie, preteen." Detective Price testified that his examination of the defendant's search history confirmed that such searches had been conducted on the defendant's laptop. Additionally, Detective Price discovered 34 images that had been viewed on the defendant's laptop and then deleted. The jury viewed each of the 34 images. The defendant testified that some of the internet searches had been performed at times when he was at work, but Ms. Emerson testified that the defendant often took the laptop to work with him. Ms. Emerson also adamantly denied having conducted any internet searches for child pornography on the defendant's laptop. In our view, the evidence presented was sufficient to support the defendant's convictions.

### III. Sentencing

Finally, the defendant asserts that the effective four-year sentence imposed for his 34 Class D felony convictions was excessive. The State contends that the sentence was appropriate.

At the sentencing hearing, the State argued that the trial court should apply enhancement factor (1), that the defendant had a history of criminal behavior in addition to that necessary to establish the appropriate range, in light of the defendant's admission of marijuana use in the presentence report, and enhancement factor (7), that the offenses were committed to gratify desire for pleasure or excitement, in light of the defendant's admitting to Detective Price that he masturbated to images of child pornography.

-11-

The defendant acknowledged that he was statutorily ineligible for probation, which rendered him ineligible for other alternative sentencing. The defendant asked the trial court to impose the minimum sentence of two years and to order that the sentences be served concurrently. In support of his request, he argued that he had no criminal record and that the offenses neither caused nor threatened serious bodily injury.

At the conclusion of the hearing, the trial court applied enhancement factor (1) based on defendant's admissions of prior marijuana use and underage drinking; enhancement factor (3) based upon its finding that there was more than one victim; and enhancement factor (7) because the offenses were committed to gratify the defendant's desire for pleasure or excitement. The court applied mitigating factor (1) because the defendant's crimes neither caused nor threatened serious bodily injury. The trial court observed that the sex offender risk assessment stated that the defendant "poses a moderate risk to sexually act out without supervision boundaries to limit access to potential victims and specific sex offender treatment to address his sexual offending." Based upon these findings, the trial court imposed a sentence of four years on each count and ordered the sentences to be served concurrently, for a total effective sentence of four years' incarceration. The court also noted that the defendant must register as a sex offender and undergo sex offender treatment while incarcerated.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The defendant does not specifically challenge the application of the enhancement or mitigating factors, and the record reflects that the trial court considered all the relevant principles associated with sentencing, including the enhancement and mitigating factors, when imposing the sentence in this case. Although the defendant had no record of criminal convictions, he admitted using marijuana and drinking before he

-12-

reached legal drinking age. The defendant also admitted to Detective Price that he masturbated while "looking at the pictures of these kids." The sex offender risk assessment classified the defendant's risk of reoffending as moderate. Under these circumstances, the record supports the sentencing decision of the trial court.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE